**Modified and Affirmed; and Opinion Filed December 9, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-01020-CR

**JOSE DEJESUS VERGARA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F17-34977-I**

## MEMORANDUM OPINION
Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Molberg

Appellant Jose DeJesus Vergara was indicted for murder and pleaded not guilty. A jury found him guilty of the lesser-included offense of criminally negligent homicide and assessed his punishment at ten years' confinement in state jail. Vergara appeals, claiming the court erred and caused him some harm by failing to give an accomplice-witness instruction[1] regarding Michael Salazar. We affirm the trial court's August 15, 2019 judgment as modified herein.

---

[1] *See* CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.")

## BACKGROUND

The case involves the killing of Jacob Krabbe, who died in an Irving, Texas apartment on October 18, 2017, after he was beaten, kicked, stripped, and left lying face down and naked, with his hands bound behind his back.

Earlier, Krabbe had forcibly entered the apartment by kicking open the front door, wearing a mask and holding a pistol. A second masked man, Stevie Lester, stood behind Krabbe, outside the door, with a rifle. According to Lester, he and Krabbe went to the apartment with the intent to rob Erasmo Nunez, who lived there, and with whom they had gone to school. Lester testified Krabbe told him before they went to the apartment that he needed to get about $1,000 by the next day to pay his lawyer.

Four individuals were inside the apartment when Krabbe kicked open the door and entered: Nunez, Vergara, and two others. Nunez and Vergara are cousins.

Vergara had gone to the apartment that day to return a pick-up truck he had borrowed from Nunez. While Vergara was inside the apartment, Vergara was startled by a loud bang. He turned around and saw Krabbe with a mask on and a gun in his hands, pointed straight at Vergara. Vergara also saw Lester in the doorway with a rifle. As Lester began entering, Nunez and others pushed and closed the door, keeping Lester outside and Krabbe inside.

A struggle with Krabbe ensued. Vergara and Nunez attempted to get the gun from Krabbe. Vergara testified that two shots were fired, and the gun's clip came

–2–

out of the gun.  Vergara took the gun away from Krabbe and tossed it to a nearby table.  Vergara grabbed Krabbe, and he and Krabbe wrestled and exchanged blows in the area around and near the dining room and the hallway that leads to the bedroom.

Vergara estimated that his struggle with Krabbe lasted for ten to fifteen minutes.  On direct-examination, Vergara's counsel asked Vergara what force he put into defending himself, and Vergara said, "Everything, everything:  I had everything.  Whatever strength I could muster up that's what I used."  He described it as a "life or death situation" and stated, "I'm fighting with everything I have."

On cross-examination, Vergara admitted he used his hands to punch Krabbe, used his feet to kick Krabbe, put a plastic bag over Krabbe's head with the intent to hurt him, and put some pressure on that bag.  Vergara agreed that hands and feet could be deadly weapons, as could putting a bag over someone's head.  Vergara also agreed that the acts done were clearly dangerous to human life.

As to the plastic bag, Vergara testified that at one point, he hit Krabbe with a blow where Krabbe "kind of like collapse[d]" and hit the ground on his back.  Vergara then got on top of Krabbe, who kept swinging, and Vergara grabbed a grocery bag and put it over Krabbe's face.  According to Vergara, Krabbe grabbed and ripped the bag as soon as Vergara put it over his face.

Vergara testified that Krabbe then stopped fighting him, and Vergara told Krabbe to turn around and get on his face. Vergara testified that at that point "the situation seemed to be controlled. No more — no more scuffle, no more fight."

Vergara testified that after his scuffle with Krabbe stopped, other men with guns arrived and began kicking Krabbe and "swarming." Vergara testified as soon as he saw Michael Salazar come in, he saw an opportunity to run to Nunez's bedroom and that, while he was there, Vergara heard "crashing, banging, [and] yelling" and knew "the beating has been continued" and that Krabbe "was stripped naked and [had] hands behind his back."

Salazar, however, provided different details, particularly with regard to Vergara's use of the plastic bag. Salazar testified that when he went inside, he saw blood everywhere. He saw Krabbe naked, lying face down, with his hands tied behind him, and he saw Vergara crouching down over Krabbe with a bag over his head. He said Vergara tied the bag on top of Krabbe and was "pulling up" on it, strangling Krabbe. Salazar testified Vergara was straddling Krabbe, who was completely naked and had his hands tied behind him. Salazar agreed "the bag [was] basically cutting off [Krabbe's] ability to breath[e] . . . killing him."

Though Vergara admitted using the plastic bag on Krabbe, he disputed Salazar's testimony regarding the scene as Salazar entered, stating, "I don't see how that can be possible because the bag was used in the kind of initial stage so I couldn't

–4–

have been strangling him [and] during that time I'm in the room with my cousin." Vergara maintained that Salazar was lying.

However, despite Vergara's suggestion that he was in Nunez's bedroom as others continued beating Krabbe, during his cross-examination, Vergara testified he saw somebody smash a ceramic jar over Krabbe's head and heard Krabbe "begging for his life" and "offering money to the people who were beating him to stop."

Salazar also testified that while Vergara was straddling Krabbe with a bag over his head, he saw three others beating, punching, stomping, kicking, or hitting Krabbe with a stick. Salazar heard Nunez yelling at them to calm down, saying "stop, you're going to kill him." Salazar considered what he saw "torture." Salazar testified there was "no struggle" going on at the time, and while it looked like Krabbe was trying to say something, he could not make out what it was. Salazar described Krabbe as being "basically on the verge of dying . . . he was on his last breath" based on Krabbe's movements and the way he was breathing. He testified Krabbe was "worse" than being beaten halfway to death; "it was almost to the end."

Salazar estimated he was inside the apartment for three to five minutes. He testified no one said anything to him, and he did not say anything to anyone. He grabbed a dog[2] in the apartment, went outside, and he and the dog waited inside the

---

[2] Salazar testified he went to the apartment that day after receiving a call from Mario Centeno, asking him to come pick up a dog. When Centeno called him, Salazar was with a friend, Kelvin Chapa, who gave Salazar a ride to the apartment and dropped him off. Chapa did not go inside the apartment.

car of Mario Centeno, who was in the apartment. Salazar estimated he waited in the car for about three to five minutes before Centeno and another person, Walker Rubio, came out of the apartment and went to Centeno's car with another dog. Centeno, Rubio, and Salazar went to Centeno's house, and Centeno took Salazar home.

Two or three days later, Salazar reported what happened to the police.

On cross-examination, Salazar agreed the only reason he went to the apartment was to get the dog. When asked if he knew that some interaction with a robber had happened before he got there, he said, "No. I just got a call to go pick up the dog." While Salazar agreed he asked Chapa to give him a ride and that they rode there together, he testified there would be no reason for him to say to Chapa that he was planning on getting in trouble. He testified he would not have said to Chapa he was going to "catch a case," a phrase which to Salazar meant "getting in trouble." Salazar denied doing anything in the apartment involving him in the beating.

After Salazar's cross-examination, Vergara's counsel called Chapa as the defense's next witness. Chapa testified that on their way there, Salazar told him there was somebody captured in the apartment. Chapa also testified that, "technically," Salazar said he was "going to get in trouble," was "going to do more than just pick up the dog" and "was going to catch a case."

When Chapa and Salazar got to the apartment, Chapa saw Salazar leave his vehicle and run towards an apartment building. Chapa said Salazar was gone "probably like five to ten minutes." When Chapa saw Salazar and another person

leave the apartment, Chapa did not see any blood on Salazar, though he did see some on the other person.

Vergara testified he did not see Salazar participate in Krabbe's beating.

During the charge conference, Vergara's counsel requested an accomplice-witness instruction under article 38.14 of the code of criminal procedure, arguing the testimony of Chapa "create[d] the possibility that Michael Salazar was a party to the offense" because Chapa said "on the drive over to the location that Michael Salazar said that he was going to catch a case, that he was going to get in trouble, that he was going to do—he was going to participate with wrongdoing." The State disagreed and argued the instruction should not be given because there was no evidence, including from Vergara, to prove Salazar was an accomplice or was a participant in the offense. The trial court refused to give the instruction.

The trial court's charge to the jury included instructions and questions regarding murder and the lesser-included offense of criminally negligent homicide. The jury found Vergara guilty of criminally negligent homicide with a deadly weapon finding and assessed punishment at ten years' confinement. On August 15, 2019, the trial court announced the sentence in open court, stating "it is the order, judgment and decree of this Court that after the jury having found you guilty of criminally negligent homicide, which included a deadly weapon finding, and having sentenced you to ten years in the Institutional Division of the Texas Department of

Criminal Justice, I hereby sentence you to ten years in the Institutional Division of the Texas Department of Criminal Justice."

Also on August 15, 2019, the court certified Vergara's right to appeal, and the court entered a judgment which, among other errors, incorrectly stated that Vergara was convicted of murder, not criminally negligent homicide, and which omitted a deadly weapon finding.

Vergara signed a notice of appeal the same day, and it was filed on August 16, 2019. The clerk's and reporter's records were filed in September and November 2019, respectively, and we later abated, then reinstated, the appeal. Vergara filed his brief on March 11, 2020.

On March 12, 2020, the trial court entered a nunc pro tunc order and judgment which reflected that Vergara was convicted of criminally negligent homicide under penal code section 19.05, a third degree felony, included a deadly weapon finding, and stated, under the "special findings" section:

> THE COURT FINDS DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, NAMELY, FIREARM, HANDS, FEET, CERAMIC JAR, BELT, PLASTIC BAG, SCISSORS, DURING THE COMMISSION OF A FELONY OFFENSE OR DURING IMMEDIATE FLIGHT THEREFROM OR WAS A PARTY TO THE OFFENSE AND KNEW THAT A DEADLY WEAPON WOULD BE USED OR EXHIBITED. TEX. CODE CRIM. PROC. ART. 42.12 § 3G.

On April 3, 2020, the State filed a motion to supplement the record with the nunc pro tunc order and judgment, noting that the trial court's docket sheet reflected that such items had been signed on March 12, 2020, and noting that the record on

–8–

appeal lacked those items.  We granted that motion in an order entered April 7, 2020.  On May 13, 2020, a supplemental clerk's record was filed containing the nunc pro tunc order and judgment, and on May 28, 2020, the State filed its brief, per our order granting the State an extension.  Vergara filed no reply.

## DISCUSSION

Vergara's sole issue on appeal concerns alleged error in the jury charge.  Specifically, Vergara argues the trial court erred and caused him some harm by refusing to submit an accomplice-as-a-matter-of-fact instruction regarding Salazar.  *See* CODE CRIM. PROC. art. 38.14.

### *Review of Alleged Charge Error*

Appellate review of purported error in a jury charge involves two steps:  first, we consider whether the jury charge was erroneous, and second, if error occurred, we consider whether sufficient harm resulted to require reversal.  *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015).  Only if we find error will we consider whether the error caused sufficient harm to require reversal.  *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (en banc).  The degree of harm necessary to require reversal depends on whether or not an appellant preserved error by objection. *Id*.  If, as here, an appellant preserved the error by objection, the error is reversible if it resulted in some harm to appellant's rights.  *Id*. at 743.[3]  Factors

---

[3] If an appellant fails to object, the error is reversible only if it resulted in egregious harm, depriving appellant of a fair and impartial trial.  *Price*, 457 S.W.3d at 440; *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Ngo*, 175 S.W.3d at 743–44.

–9–

considered in the harm analysis are: (1) the jury charge as a whole, (2) the state of the evidence, (3) the arguments of counsel, and (4) other relevant factors present in the record. *Price*, 457 S.W.3d at 440.

*Accomplice-Witness Instructions Generally*

An accomplice is someone who was or could have been charged with the same or a lesser-included offense as that with which the defendant was charged because he participated with the defendant before, during, or after the commission of the crime, acted with the requisite mental state, and performed an affirmative act promoting the commission of the offense. *See Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013).[4] An "accomplice is a blameworthy participant to the crime." *Ash v. State*, 533 S.W.3d 878, 882 n.4 (Tex. Crim. App. 2017).

Whether a defendant is entitled to an accomplice-witness instruction is a function of the evidence presented at trial. *Id*. at 884.

A witness can be an accomplice as a matter of fact or as a matter of law. *Id*. In *Ash*, after discussing the development of the law, the court stated:

> To summarize, a witness is an accomplice as a matter of law in the following situations:
>
> - If the witness has been charged with the same offense as the defendant or a lesser-included offense;

---

[4] *See also Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) ("An accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state" which "requires an affirmative act that promotes the commission of the offense with which the defendant is charged.")

- If the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant; and

- When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice.

*Id.* at 886 (footnote omitted).

Even if a witness is not an accomplice as a matter of law, if the record contains evidence that a witness may have been an accomplice, the trial court should submit to the jury the issue of whether the witness was an accomplice as a matter of fact. *See id.* at 884; *State v. Ambrose*, 487 S.W.3d 587, 593–94 (Tex. Crim. App. 2016).

However, where the evidence clearly shows that a witness was not an accomplice, a trial court is not required to instruct the jury on the accomplice-witness rule. *See Zamora*, 411 S.W.3d at 513 n.4; *Smith v. State*, 332 S.W.3d 425, 440 (Tex. Crim. App. 2011); *Cocke*, 201 S.W.3d at 748–49; *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987).

*Application*

Vergara's sole issue involves alleged error in the court's refusal to provide an accomplice-as-a-matter-of-fact instruction regarding Salazar.[5] Vergara argues the trial court erred based on Vergara's, Salazar's, and Chapa's testimony on various

---

[5] Because Vergara does not argue Salazar was an accomplice as a matter of law, we do not decide any issues in that regard, but we note that the record before us lacks evidence that he was. *See Ash*, 533 S.W.3d at 886–87 (defendant was not entitled to accomplice-as-a-matter-of-law instruction when witnesses were not charged with the same or a lesser-included offense as the defendant and the evidence was not so uncontradicted or so one-sided that rational jury would have had to believe witnesses were accomplices).

–11–

matters, including Salazar's statements to Chapa, the time Salazar spent in the apartment, Salazar's leaving the crime scene with two perpetrators, and the noises Vergara heard while in the bedroom after seeing Salazar in the room with other men.

Vergara cites various cases to support his position, but the one most analogous to this case is our prior decision in *Valencia v. State*, No. 05-12-01396-CR, 2014 WL 1056615, at *5–6 (Tex. App.—Dallas Mar. 18, 2014, no pet.) (mem. op., not designated for publication), which also involved a violent killing.[6] In *Valencia*, we concluded the trial court did not err by refusing to provide an accomplice-witness instruction regarding two witnesses present at the scene, noting the lack of proof that the witnesses were blameworthy participants. *Id.* We also noted that a person is not an accomplice simply by being present at a crime scene or by knowing about the offense, failing to disclose it, or helping the accused to conceal it. *Id.* at *5.

We agree with the State's position that, despite the conflicts in Vergara's, Salazar's, and Chapa's testimony, no conflict is present in the evidence that would have allowed the jury to reach a rational inference that Salazar was a blameworthy participant in Krabbe's killing, as there is no evidence that Salazar actively participated with Vergara before, during, or after Krabbe's killing with the requisite culpable mental state, or by acting in a manner to encourage or promote the crime.

---

[6] Vergara also cites *Ash*, a drug case involving issue regarding accomplice-as-a-matter-of-law instruction, and *Blake,* a theft and aggravated robbery case involving the viability and abolishment of the juvenile exception to the accomplice-witness rule. *See Ash*, 533 S.W.3d at 879, 882 n.3, 886 n.10; *Blake v. State*, 971 S.W.2d 451, 453, 458–59 (Tex. Crim. App. 1998). Both cases involve issues and facts distinguishable from those we decide here, and neither requires reversal.

–12–

*See Druery v. State*, 225 S.W.3d 491, 498–500 (Tex. Crim. App. 2007) (witnesses were not accomplices as a matter of law or fact where their actions— including being present before and during the murder, receiving money after the murder, and one witness's helping to dispose the body and murder weapon—were not affirmative acts to assist in the commission of capital murder or a lesser-included charge).

Thus, as the court did in *Druery* and as we did in *Valencia*, we conclude the trial court did not err in refusing to provide an accomplice-as-a-matter-of-fact instruction regarding Salazar based on this record. *See id.; Valencia*, 2014 WL 1056615, at \*6 (stating witnesses were not blameworthy participants and noting, in part, they "did not participate in the assault on [the victim], encourage the [others] to harm [him], or provide the [others] with a bat"). Finding no charge error, we need not reach the issue of harm. *See Ngo*, 175 S.W.3d at 743–44.

We overrule Vergara's sole issue.

*Modifications to Judgment*

While neither party has raised this issue, our review of the clerk's record and supplemental clerk's record has revealed that the trial court's August 15, 2019 judgment from which Vergara appeals includes information that is inconsistent with the court's judgment and sentence announced in open court on that date. Because we have the information necessary to reflect the truth, we modify that judgment to correct that information, as set forth below. Though we render no opinions on and

–13–

do not comment upon the March 12, 2020 order and judgment nunc pro tunc, we intend for these modifications to be consistent with those filings.[7]

## CONCLUSION

For the reasons discussed herein, we overrule Vergara's sole issue and affirm the trial court's August 15, 2019 judgment with the following modifications:

1.     Under "Offense for Which Defendant Convicted" on the first page, the word "MURDER" is deleted and is replaced with the phrase "CRIMINALLY NEGLIGENT HOMICIDE";

2.     Under "Statute for Offense" on the first page, the phrase "19.02(c) Penal Code" is deleted and is replaced with the phrase "19.05 Penal Code";

3.     Under "Degree of Offense" on the first page, the phrase "1ST DEGREE FELONY" is deleted and is replaced with the phrase "3RD DEGREE FELONY";

4.     Under "Findings on Deadly Weapon" on the first page, the phrase "N/A" is deleted and is replaced with the phrase "YES, A FIREARM";

5.     Under the heading stating, "Furthermore, the following special orders or findings apply" on the second page, the following text is added:

> THE COURT FINDS DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, NAMELY, FIREARM, HANDS, FEET, CERAMIC JAR, BELT, PLASTIC BAG, SCISSORS, DURING THE COMMISSION OF A FELONY OFFENSE OR DURING

---

[7] We have the power to modify a judgment to make the record speak the truth when we have the necessary information before us to do so. *Bigley v. State*, 865 S.W.2d 26, 28 (Tex. Crim. App. 1993); Tex. R. App. P. 43.2(b). In light of this inherent power, and because neither side has appealed or raised any issues with the March 12, 2020 order and judgment nunc pro tunc, we make no comment upon the trial court's jurisdiction, if any, to issue the order and judgment nunc pro tunc under the circumstances.

–14–

IMMEDIATE FLIGHT THEREFROM OR WAS A PARTY TO THE OFFENSE AND KNEW THAT A DEADLY WEAPON WOULD BE USED OR EXHIBITED. TEX. CODE CRIM. PROC. ART. 42.12 § 3G.


/Ken Molberg/
KEN MOLBERG
JUSTICE

191020f.u05
Do Not Publish
TEX. R. APP. P. 47.2



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSE DEJESUS VERGARA,
Appellant

No. 05-19-01020-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 2, Dallas County, Texas Trial Court Cause No. F17-34977-I. Opinion delivered by Justice Molberg. Justices Reichek and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

1.    Under "Offense for Which Defendant Convicted" on the first page, the word "MURDER" is deleted and is replaced with the phrase "CRIMINALLY NEGLIGENT HOMICIDE";

2.    Under "Statute for Offense" on the first page, the phrase "19.02(c) Penal Code" is deleted and is replaced with the phrase "19.05 Penal Code";

3.    Under "Degree of Offense" on the first page, the phrase "1ST DEGREE FELONY" is deleted and is replaced with the phrase "3RD DEGREE FELONY";

4.    Under "Findings on Deadly Weapon" on the first page, the phrase "N/A" is deleted and is replaced with the phrase "YES, A FIREARM";

5.    Under the heading stating, "Furthermore, the following special orders or findings apply" on the second page, the following text is added:

THE COURT FINDS DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, NAMELY, FIREARM, HANDS, FEET, CERAMIC JAR, BELT, PLASTIC BAG, SCISSORS, DURING THE COMMISSION OF A FELONY OFFENSE OR DURING IMMEDIATE FLIGHT THEREFROM OR WAS A PARTY TO THE OFFENSE AND KNEW THAT A DEADLY WEAPON WOULD BE USED OR EXHIBITED. TEX. CODE CRIM. PROC. ART. 42.12 § 3G.

As **REFORMED**, the judgment is **AFFIRMED**.


Judgment entered this 9th day of December, 2020.